(79 South. 659)

BIRMINGHAM MACHINE & FOUNDRY CO. v. WALPOLE. (6 Div. 597.)

(Supreme Court of Alabama. April 11, 1918. Rehearing Denied June 29, 1918.)

1. PRINCIPAL AND AGENT ⚫➝89(8)—RIGHT TO COMMISSIONS—SUFFICIENCY OF EVIDENCE.

In action for commissions on gross sales earned in procuring defendant company right to manufacture patented lathes, and in securing orders for such lathes, evidence *held* to support verdict for plaintiff.

2. APPEAL AND ERROR ⚫➝1005(1)—REVIEW— MOTION FOR NEW TRIAL.

Where trial court had witnesses before it, and opportunity to note their demeanor, Supreme Court is unwilling to predicate reversal on action of court in overruling motion for new trial.

3. APPEAL AND ERROR ⚫➝197(3)—OBJECTIONS IN LOWER COURT — PLEADING—AMENDMENT —RULE OF CIRCUIT COURT.

Under rule 34 of the Circuit Court (175 Ala. xxi), a point of variance between the allegations of the complaint and the proof, a matter which could have been corrected by amendment during trial of the cause, can avail defendant nothing on its appeal from an adverse judgment.

4.. PRINCIPAL AND AGENT ⚫➝89(8)—RIGHT TO COMMISSIONS—SALE WITHIN AGREEMENT— SUFFICIENCY OF EVIDENCE.

In action for commissions on gross sales earned in procuring defendant company right to manufacture patented lathes, and in securing orders for such lathes, evidence *held* to justify finding sale of certain lathes by defendant came within agreement stated by plaintiff.

5. PRINCIPAL AND AGENT ⚫➝89(5) — ACTION FOR COMMISSIONS — COMMON COUNT FOR WORK AND LABOR—EVIDENCE.

In action for commissions earned in procuring right to manufacture patented lathes, and in securing orders, contract whereby defendant company sold lathes to company owning patents, which had been procured by plaintiff to license manufacture, could be considered by jury in estimating value of plaintiff's services under common count for work and labor done.

6. PRINCIPAL AND AGENT ⚫➝89(7) — ACTION FOR COMMISSIONS—EVIDENCE.

In action for commissions for procuring right to manufacture patented lathes, and for making sales of such lathes, where defendant agreed either to pay 10 per cent. of gross sales, or made no contract with plaintiff at all, testimony of plaintiff, who qualified as competent witness, that reasonable value of services rendered was minimum of 10 per cent. on gross sales, was admissible.

7. PRINCIPAL AND AGENT ⚫➝89(7)—ACTION FOR COMMISSIONS—EVIDENCE.

In action for commissions earned in procuring right to manufacture patented lathes, and in securing orders, proof as to usual commissions in machine tool business for making sales was admissible.

Anderson, C. J., and McClellan and Sayre, JJ., dissenting in part.

Appeal from Circuit Court, Jefferson County; C. B. Smith, Judge.

Suit by N. C. Walpole against the Birmingham Machine & Foundry Company. From judgment for plaintiff, defendant appeals. Affirmed.

Suit by appellee (plaintiff) against appellant (defendant), resulting in a verdict and judgment for the plaintiff in the sum of $17,500, from which defendant prosecutes this appeal. The first four counts of the complaint were withdrawn, and the cause proceeded to trial upon counts 5, 6, 7, and 8, and the general issue joined thereon. Counts 5, 6, and 7 were the common counts for work and labor done, moneys had and received and due by account. The eighth count was for recovery of damages for breach of a special contract alleged to have been entered into between plaintiff and defendant company, wherein defendant agreed to pay plaintiff as compensation for his services in securing for defendant the right to manufacture and sell lathes of a certain type, and in assisting in the sale thereof, the sum of 10 per cent. on the gross sales of said lathes. It is further alleged that said right was obtained by plaintiff for defendant to manufacture the type of lathe known as the Le Blond lathe, resulting in the manufacture and sale of a large number of lathes by defendant at approximately $1,500 each, etc., and that defendant refuses to pay said commissions.

The evidence for the plaintiff tended to show that he had had long experience in the machinery business, and in the sale of machine tools for large manufacturing concerns; that he was engaged in the handling of machinery and machine tools on commission in the city of Birmingham at the time he contracted with the defendant company, which was engaged in the foundry and machinery business as manufacturer, to procure what is referred to as "war work" for the defendant in the year 1915; that at that time business was very dull in the defendant's line in that community, such manufactories not being operated to their full capacity; that for the purpose of manufacturing shells and projectiles a lathe is one of the chief essentials, and during that time there was great demand for munition, and to procure lathes of a known design for manufacturing shells was very difficult; that the lathe manufactured by the R. K. Le Blond Machine Tool Company, known as the Le Blond lathe, was a well known and established brand of lathe, and its construction especially well adapted for that work, and was the most popular, and greatly in demand. The Le Blond Com-

pany had a plant at Cincinnati, and their type of lathe was covered by a great many patents, and, of course, could not be used by any one else without their consent. To manufacture a lathe, it is first necessary to procure a design, which would take a long time, and then there has to be made the patterns, jigs, and fixtures in different proportions.

Plaintiff enumerated his experience in the machine tool business, his place of education, and his different employments which covered a period of several years, also his acquaintance with the Le Blond Machine Tool Company, and with their type of lathe, together with his personal acquaintance with Mr. Le Blond; that the Le Blond lathes could be sold readily and were in great demand, the price of what is known as the 25-inch Le Blond lathe having advanced from $900 a lathe to over $1,400 a lathe, and the demand could not be supplied even at that figure; that in the summer of 1915, Dr. Boland, president of the defendant company, approached the plaintiff with a view of his procuring "war business" for the defendant company. The evidence for the plaintiff tended to show that in this conversation he (plaintiff) agreed to assist the defendant company in procuring the right to manufacture these lathes, and to render assistance in the sale of same for the usual commission of 10 per centum on the gross sales of the lathes; and that this agreement with Dr. Boland was later confirmed in the office of the vice president of the defendant company. The plaintiff then went to Cincinnati to see Mr. R. K. Le Blond, the principal owner of the Le Blond Machine Tool Company, whom he had personally known for a number of years, and procured from the Le Blond Machine Tool Company a tentative proposition evidenced by letter of September 25, 1915, addressed to N. C. Walpole, Birmingham, Ala., proposing to furnish patterns for a 25, 26, or 27 inch lathe, together with complete set of drawings, routing cards, jigs, etc., necessary for the manufacture of the Le Blond type of lathe, for which the charges were fixed at $250 per lathe, with a minimum of 200 lathes, and with the understanding that the lathes should not bear the Le Blond name; that subsequent to obtaining this tentative proposition Dr. Boland, president of the defendant company, went with the plaintiff to Cincinnati; that in the year 1913 one George M. Morrow, Jr., became a partner in the plaintiff's business, and was considered as a partner by the plaintiff while these negotiations were going on, and with the assistance of plaintiff was making efforts to get "war business," including a contract from the Baldwin Locomotive Works for the purchase of lathes, and also from J. P. Morgan & Co., purchasing agents for the British government in this country. The Baldwin negotiations were not perfected, and resulted in no contract. The negotiations with Le Blond Machine Tool Company then further resulted in a tentative proposition by way of letter under date of October 16, 1915, addressed to the Birmingham Machine & Foundry Company by the Le Blond Machine Tool Company, referring to letter of September 25, 1915, addressed to N. C. Walpole, granting defendant company the right to manufacture these lathes, and fixing a minimum of 50 lathes—all of which finally resulted in a formal contract being entered into between the Le Blond Machine Tool Company and the Birmingham Machine & Foundry Company being given the right to manufacture these lathes, and a furnishing on the part of the Le Blond Machine Tool Company of certain necessary instrumentalities, patterns, etc., for the manufacture of these lathes, specifying for the manufacture of not less than 50 nor more than 200 lathes, and fixing the compensation to be paid Le Blond Machine Tool Company.

Testimony for the plaintiff further tended to show that upon the strength of these concessions by the Le Blond Company an order was then obtained from J. P. Morgan & Co., purchasing agents for the British government, for 120 lathes of the Le Blond type, at the price of $1,475 for each lathe, f. o. b. Ocean Steamer, New York City, making a total price of $117,000, which contract is set out in full in the record. It further appears that in addition to this contract, the defendant sold to Carragol & Son 10 of the same type of lathes at the price of $1,290 per lathe, f. o. b. factory, and that the defendant company had also contracted for a sale of 100 of these lathes to the Le Blond Company. The evidence for the plaintiff further tended to show that in the event the right to manufacture the lathes was procured, the defendant had agreed to obtain control of one or two other factories in the city of Birmingham, and expand the work so that deliveries might be made promptly, which was necessary, but had failed to obtain these additional factories. Plaintiff's evidence further tended to show that the Le Blond Machine Tool Company was averse to giving the right to manufacture these lathes to any concern and that in fact this was the first time such concession had been granted, and that his personal acquaintance with the principal owner of the company, and his knowledge of this particular kind of business, together with his long experience and information in regard to this particular lathe and its great demand had been the cause of his securing these concessions from the Le Blond Company, resulting in the above-mentioned business for the defendant company.

Plaintiff further testified that all along he was under the impression that Morrow,

his former partner, was still a member of the firm when the tentative proposition was obtained from the Le Blond Company, and that he did not discover that said Morrow, his former partner, was in the employ of the defendant company until after October 1, 1915; that the partnership which had been conducted theretofore under the name of N. C. Walpole was dissolved, and that he purchased the interest of said Morrow in said business, which dispensed with all his (Morrow's) rights in the matter, and that he paid said Morrow in full, by check, which was offered in evidence, for his interest in the partnership. The testimony further tended to show that plaintiff had been paid nothing on account of his services, although he had made demand therefor before bringing the suit. Plaintiff testified that 10 per cent. of the gross sales is a reasonable compensation for securing said right from the Le Blond Company, and aiding defendant company in making sales; that the usual and customary commission in machine tool business was from 10 to 17 per cent.; that he had for a number of years engaged in, and was thoroughly familiar with, the sale of machine tools on commission, and was familiar with what commissions were charged and what was reasonable. This evidence was admitted over the objection of the defendant.

The evidence for the defendant tended to show that at the time negotiations were being had with the plaintiff and Morrow, it was in contemplation that a contract was to be secured from the Baldwin Locomotive Works, and it was agreed that plaintiff and Morrow, his partner, should be paid for their services 5 per cent. each on the profits which the defendant was to make out of the sale of the lathes, and that there was no agreement to pay 10 per cent. on the gross sales, but only on the net profits.

The evidence of Morrow, who was the former partner of plaintiff, and that of Vice President Hassinger was offered to establish these facts, the latter being the vice president of the defendant company at the time. Witness Morrow testified that he agreed the commission was to be on the net profits, and that he made such agreement with the vice president, and plaintiff was notified thereof. Hassinger testified to like effect. It appears from Morrow's testimony, as well as the other evidence for the defendant, that at the time these negotiations were going on, he (Morrow) was negotiating with the defendant company, or rather the company was negotiating with him for employment with the defendant, which seems to have been definitely agreed upon in September, and his employment began as an assistant to the president on October 1, 1915, at which time his salary began. Other evidence offered by the defendant tended to show that negotiations for Morrow's employment were being

had some time before October 1st, when his salary began, although the plaintiff insisted that all the while he knew nothing of this employment, or such negotiations, but thought that Morrow was still interested with him in business. The evidence for the defendant further tended to show that the agreement to pay Walpole and Morrow 5 per cent. each on the net profits of the sale of the lathes was, strictly speaking, only applicable to a contract of purchase which was then in contemplation by the Baldwin Locomotive Works, which, however, did not materialize; but the contract with J. P. Morgan & Co. did subsequently materialize, and that on account of the plaintiff's services they thought it right, or at least morally bound, that he should be paid a percentage on the profits from that contract. The evidence further tended to show that there had been realized about $190,000 out of the contracts for the sale of these lathes, and that of this sum the net profits realized were $27,000; that the defendant had never made lathes and therefore was inexperienced in this class of work, and did not want to subject itself to liability for commissions for more than a percentage on the net profits realized. Defendant's evidence further showed that they had an order from the Le Blond Machine Tool Company for 100 lathes, and that about 30 out of the order for 100 had been delivered.

Dr. Boland, witness for the defendant, denied that he had an agreement with the plaintiff whereby he was to be paid the usual commission of 10 per cent. on the gross sales of the lathes, should he secure for defendant company the right to manufacture the same. He admitted, however, numerous conversations with the plaintiff in regard to the business, and to being with the plaintiff on some occasions as testified to by the plaintiff. He also admitted that in an interview with the plaintiff, in Hassinger's office, it was stated the plaintiff wanted 10 per cent. on the gross sales price, but nothing was agreed upon, witness saying:

"The 10 per cent. was to be on the lathes. I do not know that; that was threshed out, whether that was to be on the cost of building the lathes or the sale price of the lathes."

The witness also stated that the profits of the defendant company for the year 1916—that is on the work turned out—was about $90,000, but he could not state what portion of the business was the lathe business, saying:

"It would take me through a whole course of bookkeeping; I could not tell you. The lathe business was not as much as a half; was not as much as a third; it might have been as much as 25 per cent."

This witness on redirect examination stated that the commission should have been on the profits and not on the cost of the machine, as some of his testimony previously tended to show.

In speaking of the employment of Morrow

by the defendant company, witness Boland said:

"Mr. Hassinger is the gentleman who made the arrangement with Morrow to come with my firm. I think he made the arrangement in October. The proposition must have been discussed with Morrow in September. I could not tell what time in September. I know when Morrow went to work for the defendant company. Before that time it might have been several months before an arrangement had been made with Morrow, looking to his going, or offering him that position, because I would go there every few days and talk with Mr. Morrow about other matters, but had in my mind the employment feature."

Several telegrams and some letters, passing between the parties to this litigation, were offered in evidence, which need not be here set out.

The contract of September 22, 1916, between the Le Blond Machine Tool Company and defendant company is set out on pages 114–116, inclusive, of the record, and provides for the purchase by the Le Blond Machine Tool Company from the defendant company of lathes at the sum of $1,050 for each 25-inch machine built with a 12-foot bed, and for each additional 2 feet of bed required by the purchaser, said purchaser is to pay the seller at the rate of $35, and for each 2 feet of bed less than 12 feet required, there is to be a rebate of $35; the purchaser further agreeing to pay the seller $11 extra for each middle leg that is required. There had been made under the terms of this contract some 34 or 35 machines.

Witness Morrow testified that after October 1, 1915, he was not a partner of Walpole, but on that date his salary began with the defendant company; that he did not dispose of his interest in these commissions to the plaintiff in selling his interest in the firm. Witness Boland, however, testified in substance that there were not due Morrow commissions because of the fact that he was at that time in the employ of defendant, and that his time belonged to the defendant. The defendant reserved exception to the following statement in the oral charge of the court:

"If you further find from the evidence that the defendant repudiated such contract, and refused to pay the plaintiff anything, the plaintiff is entitled to recover in this action for all the damages he has suffered up to this time, and all the damages which he may suffer, which you are able to calculate with reasonable certainty."

The following charge was refused to the defendant:

"The court charges the jury that under the evidence no damages can be awarded against the defendant on account of the 100 lathes that were manufactured by the defendant company for Le Blond under the contract—put in evidence—of September 22, 1916."

There was verdict for the plaintiff assessing his damages at $17,500. Motion for a new trial was made, and argued before the court; one of the principal grounds being that the verdict was contrary to the great weight of the evidence, and should be set aside. This motion was overruled.

Weakley & Rice and Tillman, Bradley & Morrow, all of Birmingham, for appellant. Erle Pettus and J. T. Stokely, both of Birmingham, for appellee.

GARDNER, J. [1] The nature of this litigation and the tendency of the evidence for the respective parties as well as the questions presented for consideration on this appeal sufficiently appear in the statement of the case. The assignment of error most strenuously insisted upon by counsel for appellant is that relating to the action of the court in overruling the motion for a new trial; the insistence being that the verdict was contrary to the overwhelming weight of the evidence to such an extent as to force the conviction that it was wrong and unjust, and that therefore it should be set aside.

The evidence is somewhat voluminous, and treats of many details of conversation, correspondence, and numerous negotiations. It would serve no useful purpose to enter into a detailed discussion of the same here. The long experience of the plaintiff in the sale of machine tools and matters of that character, as well as his experience as a trained mechanic and his information in regard to the great demand for the purchase of lathes —together with his personal acquaintance and friendly relation for a number of years with the principal owner of the Le Blond Machine Tool Company—referred to in the statement of the case, were evidently important factors in securing the concessions granted the defendant by the Le Blond Machine Tool Company, by which the defendant was given the right to manufacture the Le Blond type of lathe, which the evidence is without dispute was the lathe most highly in favor and greatest in demand.

The agreement for a commission of 10 per cent. on the gross sales was not in writing; but the plaintiff explains that the defendant promised at one time to reduce the agreement to writing, and he was told that he would be "treated right" by the defendant. It is clear, however, throughout all the evidence that the plaintiff was insisting strenuously upon 10 per cent. on the gross sales of the lathes as his commission. While the president of the defendant company denies that he agreed or made any arrangement with the plaintiff in regard to such a commission, yet a careful examination of his evidence discloses that in several particulars he corroborated the plaintiff in certain details, which would require too much space to here set out.

Witness Morrow, plaintiff's former partner, and a principal witness for the defendant in this cause, was at the time of the trial vice president of the defendant company, although he owned only a few shares of stock. Before he became vice president, the position of assistant to the president was created for his special benefit. It further satisfactorily appears that at the very time these negotia-

tions were being carried on, he (Morrow) had accepted employment from the defendant. He insists that he made the arrangement with Hassinger, then vice president, for a commission on the basis of the net profits, and that he so notified the plaintiff. Plaintiff, however, testified that he met Morrow in a hotel in New York and asked him if he (Morrow) had any understanding with Hassinger, the vice president, as to compensation, to which he replied he did not; that on the other hand he (Morrow) told plaintiff "that he [plaintiff] was the man to make those things," and that he had nothing to do with that. At that time plaintiff did not know that Morrow had left his partnership, and had gone on October 1st to the defendant company. But we forego any further reference to the testimony in the cause. Suffice it to say it has been given most careful and thorough consideration.

[2] The trial court had the witnesses before it, and an opportunity to note their demeanor upon the stand. Under such circumstances, the familiar rule announced in Cobb v. Malone, 92 Ala. 630, 9 South. 738, remains unaffected by recent legislative enactment. Hackett v. Cash, 196 Ala. 403, 72 South. 52; Hatfield v. Riley, 74 South. 380;[1] Price v. Price, 74 South. 381.[2] Under this well-settled rule we are unwilling to predicate a reversal of the cause upon the action of the court in overruling the motion for a new trial.

[3] The next assignment of error insisted upon relates to the exception by the defendant to that portion of the oral charge of the court found in the statement of the case. The argument rests upon the theory that this portion of the charge ignores that part of the evidence showing that the transaction, out of which this suit grew, was had with N. C. Walpole and George M. Morrow as partners, and authorized a judgment in favor of the plaintiff alone upon refusal of defendant to pay him; the insistence being that the suit should have been brought in the name of the partnership, or rather in the name of Walpole and Morrow, partners in business, and not in the name of N. C. Walpole alone; and that a suit by N. C. Walpole would not be sustained by proof of transactions between the defendant and Walpole and Morrow, partners in business under the firm name of N. C. Walpole. As we construe the argument it, in substance, rests upon the variance between the allegations of the complaint and the proof which was a matter that could have been corrected by amendment during the trial of the cause.

The evidence for the plaintiff tended to show that whatever interest Morrow had in the partnership affairs had been purchased by him (plaintiff), which would include these commissions, and if the complaint should have alleged that the agreement was originally entered into by the defendant and plaintiff and Morrow, as partners, and that plaintiff subsequently acquired Morrow's in-

terest, this was a matter which could have been easily remedied by amendment upon the trial of the cause.

The affirmative charge was not asked by the defendant, nor was the attention of the court in any manner directed to any question of variance. Under circuit court rule 34 (175 Ala. xxi), such a question of variance under these circumstances can avail the defendant nothing on this appeal. Woodward v. Steel, 192 Ala. 538, 68 South. 473. It is to be noted also that the complaint contained the common counts, and the jury could infer that the services were performed by the plaintiff under an implied contract subsequent to the dissolution of the partnership.

[4, 5] The charge set out in the statement of the case, refused to the defendant, would eliminate from the consideration of the jury any damages to be recovered on account of the sale of 100 lathes to the Le Blond Machine Tool Company under the contract of September 22, 1916. This contract for 100 lathes at $1,050 each to be sold by the defendant company to Le Blond Machine Tool Company was introduced without objection.

The plaintiff insisted that his commission was to be 10 per cent. on the gross sales of the lathes, and that this commission was in compensation for his having procured for defendant the right to manufacture these lathes as well as also giving assistance on his part in making sales thereof.

It further appears that in the original proposition of the Le Blond Machine Tool Company made to the defendant, the number of lathes to be manufactured was not limited, and the tendency of the evidence shows that the limitation of 200 lathes in the final contract was at the defendant's request, or at least in accord with its wish. The witness Morrow testifying upon this point said:

"The proposition made out to the Birmingham Machine & Foundry Company was practically the same proposition, except in the final contract we got it specified that we could not make over 200 lathes, with the stipulation that when we finished that we could make more, provided both parties agreed to it. The fact that the defendant company had procured the right from Le Blond was used as an inducement with the Baldwin Company and the Morgan Company to procure their business. It was that that put the defendant company in a position to manufacture the Le Blond lathes."

The first agreement appears to be dated October 16, 1915, and the contract with Morgan & Co., purchasing agents for the British government, for 120 lathes is of date October 21, 1915, while the formal contract between the Le Blond Company and the defendant, specifying a limitation of 200 lathes, is dated October 29, 1915. We are of the opinion the jury could infer that the sale of these lathes to Le Blond Machine Tool Company by the defendant came within the agreement stated by the plaintiff, and that there was no error in refusing said charge. Moreover, this contract could properly be considered by the jury in estimating the value of plaintiff's

[1] 199 Ala. 388.          [2] 199 Ala. 433.

services under the common count for work and labor done.

[6, 7] The plaintiff insisted that he was entitled to 10 per cent. as commission on the gross sales, while the defendant on the other hand contended that no such contract was made. The evidence of witnesses Morrow and Hassinger indicate that, in fact, the plaintiff had no contract for any agreed amount of commissions on account of the sale of these lathes at the time he began negotiations with the Le Blond Machine Tool Company. The testimony of these witnesses tends to show that the agreement as to the 5 per cent. commission on the net profits was only applicable to the Baldwin Locomotive Works, which contract did not materialize; but that, as the plaintiff had performed considerable service in the matter, they regarded it as proper that he should be given a percentage on the profits out of the Morgan contract. This concession on the part of Hassinger appears only by way of a statement by Hassinger to Morrow—plaintiff not being present—in New York at the time the Morgan contract was signed in the latter part of October, 1915, and at a time subsequent to the withdrawal of Morrow from the partnership agreement with the plaintiff, and when he was in fact a salaried employé of the defendant company. If, therefore, there was no valid contract for a commission of 5 per cent. of the profits, this would lead to the proposition either that defendant agreed to pay the plaintiff 10 per cent. of the gross sales, as he insisted, or that it had no contract with him at all, and must pay him therefore the reasonable value of his services. It was therefore entirely proper to show by the plaintiff, who qualified as a competent witness, that the reasonable value of the services rendered was a minimum of 10 per centum on the gross sales. It was also not objectionable to offer proof as to the usual commissions in the machine tool business for making sales. There is no reversible error therefore in the action of the court in overruling the objection to this testimony.

We have here treated the assignments of error argued by counsel for appellant, and we find nothing in any of them calling for a reversal of the cause. The judgment will accordingly be affirmed.

Upon consideration of the cause by the entire court, Justices MAYFIELD, SOMERVILLE, and THOMAS concur with the writer in the opinion. Chief Justice ANDERSON and Justices McCLELLAN and SAYRE concur in the opinion, except as to the charge refused defendant, set out in the statement of the case, and they entertain the view that the lathes involved in the contract between defendant and Le Blond Machine Tool Company should not have entered into the consideration of the jury, and that the commission as to these lathes could be deducted from the judgment rendered, and the cause as thus modified should be affirmed. They therefore in part dissent.

Affirmed.

MAYFIELD, SOMERVILLE, and THOMAS, JJ., concur. ANDERSON, C. J., and McCLELLAN and SAYRE, JJ., dissent in part.